IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:09-CT-3066-D

| | | |
|---|---|---|
| ROGER LEE DEAL, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| CAPE FEAR VALLEY HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |

On April 8, 2009, Roger Lee Deal, Sr. ("Deal" or "plaintiff"), a state inmate, filed this action against Cape Fear Valley Hospital ("the hospital") under 42 U.S.C. § 1983 [D.E. 1]. On October 26, 2009, the court reviewed Deal's complaint under 28 U.S.C. § 1915, dismissed as frivolous Deal's claims against the hospital, denied Deal's motions for a preliminary injunction and appointment of counsel, and directed Deal to particularize his claims [D.E. 9]. In response, Deal filed an amended complaint and named as new defendants the Head Medical Director of the North Carolina Department of Correction Utilization Review Board ("DOC URB"), Pender Correctional Institution ("PCI") physician Dr. Micklos,[1] PCI Nurse Padgett, and Maury Correctional Institution ("MCI") physician Dr. Leggett [D.E 10].

On February 2, 2011, the court granted motions to dismiss by all defendants except Micklos [D.E. 39]. On July 28, 2011, the court entered a scheduling order [D.E. 42]. On August 2, 2011, the court denied Deal's second motion for appointment of counsel [D.E. 43]. On August 4, 2011,

---

[1] The complaint incorrectly identifies this defendant as "Micklas." Mem. Supp. Micklos Mot. Dismiss [D.E. 27] 1.

Micklos answered the complaint [D.E. 44]. On October 26, 2011, Micklos filed a motion for summary judgment [D.E. 50], along with a supporting memorandum, an affidavit, and exhibits [D.E. 51–54]. Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the court notified Deal about the motion for summary judgment, the consequences of failing to respond, and the response deadline [D.E. 55]. On November 2, 2011, Deal filed a third motion to appoint counsel [D.E. 56]. On November 3, 2011, Deal filed an exhibit in support of his third motion to appoint counsel [D.E. 57]. On November 18, 2011, Deal filed a document describing his current medical condition [D.E. 58]. On December 22, 2011, Deal filed a second motion for preliminary injunction [D.E. 59], which lacked an original signature [D.E. 60]. On January 9, 2012, Deal filed a corrected second motion for preliminary injunction [D.E. 61]. As explained below, the court grants Micklos's motion for summary judgment [D.E. 50], and denies Deal's motions [D.E. 56, 61].

I.

The court limits its discussion to those facts relevant to Deal's remaining claim against defendant Micklos. In 2002, Deal was convicted of second-degree murder and incarcerated. Am. Compl. [D.E. 10] at 7. According to Deal, in "1993 or 1994," he "was struck by a pickup truck while he was on his riding lawn mower and was [knocked] 14 ft off the road." Id. at 3; see Micklos Aff. ¶ 5. Deal has required medical treatment for severe back pain ever since the accident. Am. Compl. at 3–34. Since Deal's 2002 incarceration, Deal has received various treatments within the DOC, including several surgeries, antibiotics, MRIs, CT scans, x-rays, a back brace, and—of significance to the instant motion—pain medication. Id. at 7–21.

Micklos began treating Deal on February 16, 2006, and stopped treating Deal on August 26, 2008, when the DOC transferred Deal from PCI to MCI. Micklos Aff. ¶¶ 8, 131. According to Micklos,

2

> Between the dates of February 16, 2006 through August 26, 2008, [Micklos] personally examined inmate Deal on at least twenty-four (24) occasions and performed chart reviews of his medical record on at least fifty-four (54) occasions. [Micklos] also gave telephone orders when necessary on at least five (5) occasions and over twenty-nine (29) UR Requests for various treatment modalities, including but not limited to x-rays, pharmacy, and specialist referrals, were submitted while inmate Deal was under [Micklos's] care. Inmate Deal was examined by nurses in sick call appointments on at least fifty-seven (57) occasions and was seen in the medical clinic after his return from outside appointments on more than eight (8) occasions. While under [Micklos's] care, inmate Deal was referred to the Orthopedic Clinic on at least five (5) occasions, was referred to the Neurology Clinic for pain management on at least two (2) occasions and underwent at least ten (10) radiographic studies of his back, hip and leg. Inmate Deal was also referred to an outside neurosurgeon, Dr. Price, for at least three appointments. During those appointments, diagnostic tests were ordered and interpreted and inmate Deal was evaluated for his complaints of pain. Upon review of his lumbar MRI, Dr. Price did not recommend surgery and did not feel that a follow-up appointment was needed.

Id. ¶ 132; see also id. ¶ 6. Micklos also provided Deal with a number of accommodations, including a bed board, an egg-crate mattress, a "handicapped card for his clothes, recreation and library," and a walker. Id. ¶¶ 19, 22, 32, 81, 86, 88 & Exs. 14–15, 17, 24, 57, 63, 69–71.

Despite Micklos's efforts, over the extensive course of Deal's treatment, Deal repeatedly sought out changes to his medication regimen and increased doses of narcotic medications. See, e.g., id. ¶¶ 8, 13, 16, 19, 25, 28, 33, 49, 69, 78, 81 & Exs. 4, 6, 8–9, 12–15, 17, 20, 22–23, 26, 38, 54–55, 57, 63. Thus, on June 5, 2006, Micklos examined Deal for pain management.

> On this date, inmate Deal signed a pain management contract (Narcotic Analgesic Contract). The pain management contract provided, in part, that inmate Deal must be on time to all of his appointments[2] or have a written excuse for being absent, and that failure to comply with the terms of the contract could result in suspension of all narcotic pain prescriptions and/or disciplinary action. I ordered a chart review for June 7, 2006, a complete metabolic panel (CMP) and liver function tests (LFT), to monitor the health of inmate Deal's organs because he was taking narcotic

---

[2] Deal missed at least twenty-two scheduled appointments during his treatment at PCI. Micklos Aff. ¶ 132.

medication .... I also ordered Methadone[3] 5 mg (an opioid used to treat pain), every eight hours for one month, and Percocet, one tablet every 12 hours for breakthrough pain which could be used four hours after Methadone.

Id. ¶ 30 & Ex. 24. On January 29, 2007, Micklos ordered testing "to ensure that inmate Deal was taking his medication as prescribed and was not diverting the Methadone[.]" Id. ¶ 74 & Exs. 57, 59. On June 4, 2007, Micklos reviewed "Deal's chart and ordered a narcotic taper" of the Methadone dosage because Deal "exhibited increased tolerance to the Methadone that he was taking, which was rendering the drug ineffective and [Micklos] felt it was in his best interest to taper the medication." Id. ¶ 87 & Ex. 70.

At some point in August 2007, defendant Micklos "put the plaintiff on what he called a vacation from a narcotic and told the plaintiff at any time the pain was to [sic] much to bear, he would put the plaintiff back on his pain medication." Am. Compl. at 18; see Micklos Aff. ¶¶ 6, 95. Micklos ordered the

> drug holiday for 90 days.[4] A drug holiday is an acceptable medical practice used to rid the body of a narcotic so that the narcotic can regain effectiveness after a period of continuous use. The purpose of the drug holiday is to reduce the body's tolerance to the narcotic, which may require increased dosages. Inmate Deal exhibited increased tolerance to the narcotic pain medications he was taking, which was rendering the narcotics ineffective and I felt it was in his best interest to proceed with a drug holiday.

Micklos Aff. ¶ 6.

During the drug holiday, Deal repeatedly "put in sick-calls and filed grievances to be put back on his medication because of all the back pain and now severe hip pain[,] . . . [yet] Mickl[o]s still

---

[3] Deal has submitted a patient information note on the potential side effects of Methadone [D.E. 75-1].

[4] Deal alleges in his complaint that the "holiday" lasted six months. Am. Compl. at 18. The medical records—which Deal does not dispute—belie Deal's allegations.

4

would not put the plaintiff back on his pain medication...." Am. Compl. at 18. However, Micklos "did not ignore inmate Deal's complaints of pain and provided numerous other medications and options for him during the Methadone 'vacation.'" Id. ¶¶ 6, 95. For example, at various times during the "holiday," Micklos prescribed Elavil, Neurontin, Ultram, ibuprofen, Voltaren, Baclofen, and Tramadol. Id. ¶¶ 95, 100–01, 108 & Exs. 74, 77–78, 82–83, 88. Moreover, Micklos also "requested a follow-up appointment at the Orthopedic Clinic for consideration of hip replacement or continued pain management with a resumption of the Methadone prescription" at the end of the 90-day period, renewed Deal's handicapped card, provided him with a doughnut cushion, ordered x-rays, examined Deal personally on at least five occasions, and reviewed his chart on at least five occasions. Id. ¶¶ 96–108 & Exs. 77–88. Nurses also examined Deal on at least eight occasions, and an orthopedist examined Deal during the 90-day period. Id. On November 13, 2007, Micklos renewed Deal's Methadone prescription. Id. ¶ 108 & Ex. 88.

II.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In

5

making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

In order to establish an Eighth Amendment claim for denial of medical care, a prisoner must establish "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quotation omitted).

Deliberate indifference requires that a defendant know of and purposefully ignore "an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. It is "obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." Whitley v. Albers, 475 U.S. 312, 319 (1986), abrogated on other grounds by Wilkins v. Gaddy, 130 S. Ct. 1175 (2010). Deliberate indifference "sets a particularly high bar to recovery." Iko, 535 F.3d at 241. "In order to establish a claim of deliberate indifference to a medical need, the need must be both apparent and serious, and the denial must be both deliberate and without legitimate penological objective." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999).

Micklos acknowledges that Deal's "alleged injury was sufficiently serious to trigger the objective prong of a § 1983 action" but contends that he is entitled to summary judgment because the medical record shows that he provided an extensive range of treatment to Deal, not only generally during the course of Deal's incarceration at PCI, but also during the "Methadone holiday." Mem. Supp. Mot. Summ. J. 6–11. Micklos acknowledges that some of his treatment decisions

6

concerning tapering and suspending Deal's Methadone prescription were guided by a "particular[] sensitiv[ity] to inmate requests for pain medication because abuse of such medication is a common occurrence among the prison population" and "[i]nmates will often engage in drug-seeking behavior by continuously seeking pain medication from multiple healthcare providers." Id. 9.

Micklos's conduct does not rise to a level of deliberate indifference. See, e.g., Lacy v. Shaw, 357 F. App'x 607, 610 (5th Cir. 2009) (per curiam) (unpublished); Kimpel v. Cal. Dep't of Corrs., No. 08CV1734-LAB(JMA), 2010 WL 532522, at *5 (S.D. Cal. Feb. 8, 2010) (unpublished); Atakpu v. Lawson, No. 1:05-CV-00524, 2008 WL 5233467, at *11 (S.D. Ohio Dec. 11, 2008) (unpublished); McManus v. Schilling, No. 2:07cv74, 2008 WL 682577, at *8 (E.D. Va. Mar. 7, 2008) (unpublished). Thus, Micklos is entitled to summary judgment.

As for Deal's third motion to appoint counsel [D.E. 56] and corrected second motion for preliminary injunction [D.E. 61], Deal has not presented anything which warrants the court's reconsideration of its previous denial of similar motions. Accordingly, the court (again) denies the motions. See [D.E. 9] 4, [D.E. 43] 1–2.

III.

For the reasons stated, the court GRANTS defendant Micklos's motion for summary judgment [D.E. 50] and DENIES plaintiff's motions [D.E. 56, 61]. The Clerk of Court shall close the case.

SO ORDERED. This 19 day of April 2012.

JAMES C. DEVER III
Chief United States District Judge

7